In the
**UNITED STATES DISTRICT COURT**
for the **SOUTHERN DISTRICT OF INDIANA,**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| LARRY L. HITE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| *vs.* | ) | **CAUSE NO. 1:04-CV-1822-SEB-VSS** |
| | ) | |
| JO ANNE B. BARNHART, Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## E N T R Y

Plaintiff Larry L. Hite seeks judicial review of the defendant Commissioner's denial of

his application for disability benefits under the Social Security Act.  The Court's review is

limited:  we determine only whether the Commissioner's factual findings are supported by

substantial evidence in the record and whether any material errors of law have occurred.  42

U.S.C. § 405(g); *Skarbeck v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004); *Gudgel v. Barnhart*,

345 F.3d 467, 470 (7th Cir. 2003).  "Substantial evidence" under the Act is less than a

preponderance:  it is only that quantity and quality of evidence that is sufficient for a reasonable

person to conclude that it supports the Commissioner's decision.  *Richardson v. Perales*, 402

U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Carradine v. Barnhart*, 360 F.3d 751, 758

(7th Cir. 2004); *Wood v. Thompson*, 246 F.3d 1026, 1029 (7th Cir. 2001).  This deferential

standard of review derives from the principle that Congress has designated the Commissioner,

not the courts, to make disability decisions under the Act:

> In reviewing the decision of the ALJ, we cannot engage in our own analysis of
> whether [the claimant] is severely impaired as defined by the SSA regulations.

1

> Nor may we reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute our own judgment for that of the Commissioner.  Our task is limited to determining whether the [Commissioner's] factual findings are supported by substantial evidence.

*Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004).  *Carradine*, 360 F.3d at 758.  Unlike the Court's limited review of the Commissioner's factual findings, it reviews the legal bases for her decisions *de novo*.

Disability is statutorily defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) and 1382(a)(3)(A).  A person will be determined to be disabled only if his impairments "are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).  The combined functional effect of all of a claimant's impairments shall be considered throughout the disability-determination process.  42 U.S.C. §§ 423(d)(2)(B) and 1382a(a)(3)(G).

The Social Security Administration has implemented these statutory standards in part by prescribing a "five-step sequential evaluation process" for determining disability.  20 C.F.R. §§ 404.1520 and 416.924.  If disability status can be determined at any step in the sequence, an application will not be reviewed further.  *Id.*  At the first step, if the claimant is currently engaged in substantial gainful activity, then he is not disabled.  Second, if the claimant's impairments are not severe, then he is not disabled.  A severe impairment is one that

"significantly limits [a claimant's] physical or mental ability to do basic work activities."  20

C.F.R. §§ 404.1520(c) and  416.924(c).  Third, if the claimant's impairments, either singly or in

combination, meet or equal the criteria of any of the conditions included in the Listing of

Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, then the claimant is deemed disabled.

The Listing of Impairments are medical conditions that the Administration has pre-determined

are disabling based on specified signs, symptoms, and functional effects.  20 C.F.R. § 404.1525.

If the claimant's impairments do not satisfy a Listing at step three, then his residual functional

capacity ("RFC") will be determined for the purposes of the next two steps.  RFC is a claimant's

remaining ability to do work on a regular and continuing basis despite his impairment-related

physical and mental limitations.  20 C.F.R. §§ 404.1545 and 416.945.  At the fourth step, if the

claimant has the RFC to perform his past relevant work, then he is not disabled.  Fifth,

considering the claimant's age, work experience, and education (which are not considered at step

four), and his RFC, he will not be determined to be disabled if he can perform any other work in

the relevant economy.

    The burden rests on the claimant to establish steps one through four.  The  burden then

shifts to the Commissioner at step five to establish that there are jobs that the claimant can

perform in the national economy.  *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).  If a

claimant has only exertional limitations, the Medical-Vocational Guidelines, 20 C.F.R. Part 404,

Subpart P, Appendix 2 (the "grids"),  may be used at step five to arrive at a disability

determination.  The grids are tables correlating age, work experience, education, and RFC with

predetermined disabled or not-disabled findings.  20 C.F.R. §§ 404.1569 and 1569a.  If a

claimant has non-exertional limitations or exertional limitations that restrict the full range of

employment opportunities at his RFC level, then use of the grids is prohibited and a vocational

expert must testify regarding the numbers of jobs in the economy for a person with the

claimant's vocational and medical characteristics.  *Id.*; *Lee v. Sullivan*, 988 F.2d 789, 793 (7th

Cir. 1993).  The grid result, however, may still be used as an advisory guideline in such cases.

20 C.F.R. § 404.1569.

Applications for disability benefits are given initial and, if requested, reconsideration

review by administration medical and vocational experts.  If the claimant is dissatisfied with

these decisions, he may request a hearing before an administrative law judge (ALJ).[1]  A claimant

who is dissatisfied with the ALJ's decision may request the Social Security Administration's

Appeals Council to review the decision.  If the Appeals Council either declines to review or

affirms the ALJ's decision, the claimant may file an action in district court for judicial review.

42 U.S.C. § 405(g).  If the Appeals Council declines to review an ALJ's decision, the ALJ's

decision becomes the final decision of the Commissioner that is judicially reviewed.

Mr. Hite filed an application for disability benefits on March 1, 2000, alleging that he has

been disabled since May 30, 1995 due to pain in his feet, knees, and lower back; hypertension;

and diabetes mellitus.  (R. 104).[2]  In the Disability Report that accompanied his application, Mr.

---

[1] Initial and reconsideration reviews in Indiana are performed by an agency of the state government — the Disability Determination Bureau, a division of the Indiana Family and Social Services Administration — under arrangement with the Social Security Administration.  20 C.F.R. Part 404, Subpart Q.  Hearings before administrative law judges and subsequent proceedings are conducted by personnel of the federal Social Security Administration.

[2] On his application form, Mr. Hite described his disabling condition as "pain in feet, knees, and lower back, HTN, DM."  (R. 104).

Hite described the illnesses, injuries, or conditions that limit his ability to work as arch bones in his feet that are completely broken down, causing pain in his feet, knees, and lower back  (R. 124).  He claimed that this condition limited his ability to work because his walking and standing have been greatly limited and that he quit work because of pain in his feet, knees, and lower back.  (*Id.*).  The initial reviewers recorded a primary diagnosis of foot deformities that they found could lead to knee and back pain.  (R. 87).  They also found that there was no medical evidence in the file establishing a secondary diagnosis.  (*Id.*).  The reviewers concluded that Mr. Hite was not disabled because "[t]he medical evidence shows normal gait and station and no loss of motion in any joint.  The evidence does not show any other condition which would significantly limit your ability to work."  (R. 90).  Mr. Hite sought reconsideration review, (R. 94), which resulted in the same diagnosis, (R. 88), and confirmed the initial rationale for denial, (R. 96).

Mr. Hite requested a hearing before an ALJ, (R. 98), which was held on January 22, 2002.  (R. 27).  At this hearing, Patsy Maikranz, M.D., testified as a medical expert on invitation of the ALJ and without objection by Mr. Hite.  (R. 42, 43, 102A).  She is board-certified in internal medicine, nephrology, critical-care medicine, and hypertension.  (R. 43, 102).  Ray O. Burger testified as a vocational expert on invitation of the ALJ and without objection by Mr. Hite.  (R. 66, 67, 103, 103A).  Mr. Hite also testified at the hearing.  (R. 4).  He was represented at the hearing, as he was throughout the administrative process.  At the conclusion of the hearing, the ALJ stated that he would hold open the record in order to receive additional medical evidence from Mr. Hite.  (R. 71-72).  After the hearing, Mr. Hite submitted office notes of Timothy Gatewood, M.D., his primary treating physician after his last-insured date, (R. 311,

5

260); reports of post-hearing x-rays[3] taken on January 30, 2002, (R. 320, 276); Dr. Gatewood's opinion that the x-rays showed Mr. Hite's condition at the time he was last insured, (R. 325); a report of a 2001 right upper extremity EMG showing right carpal tunnel syndrome, (R. 330); upper extremities symptom and function questionnaires completed by Dr. Gatewood after the hearing in late February 2002, (R. 331, 334);[4] and a vocational evaluation of Mr. Hite completed by Samuel I. Goldstein, Ph.D., licenced psychologist and certified vocational expert, (R. 336).

The post-hearing carpal-tunnel evidence led the ALJ to obtain a supplemental opinion from Ray Burger, the vocational expert, incorporating a lifting limit of fifteen pounds and a preclusion of operating vibrating tools. (R. 162-69). In response, Mr. Hite requested a supplemental hearing and the testimony of an expert in orthopedic medicine. (R. 170). The ALJ convened a second hearing on November 8, 2002, (R. 74), at which a new vocational expert, Gail Ditmore, testified without objection, (R. 79). Because Mr. Burger was not available for questioning regarding his supplemental opinion, Mr. Hite agreed to strike the previous vocational testimony entirely and to obtain new comprehensive vocational evidence from Ms. Ditmore. (R. 76-77). At the second hearing, Mr. Hite's representative briefly addressed Mr. Hite's post-first-hearing x-rays and interpretations, (R. 78), but the ALJ did not call a supplemental medical expert.

At the time of the hearing, Mr. Hite was 63 years old, (R. 31); he had a high-school

---

[3] X-rays were taken of Mr. Hite's lumbar-sacral spine, left foot, right foot, left knee, and right knee. (R. 276, 320).

[4] Lower extremities, pain, and rest questionnaires by Dr. Gatewood were submitted before the hearing. (R. 252-55).

education, (R. 32, 130); and his past relevant work was as an inspector and a union steward, (R. 33-34, 125).  The ALJ found that Mr. Hite was last insured for disability benefits on September 30, 2001 and Mr. Hite did not dispute the finding.  (R. 19, 30).[5]

The ALJ denied Mr. Hite's application for benefits on January 30, 2003.  (R. 18).  At step one of the five-step sequential evaluation process, he found that Mr. Hite had not engaged in substantial gainful activity since his alleged onset date of May 30, 1995.  (R. 19, 25).  At step two, the ALJ found that Mr. Hite has the following severe impairments:  degenerative disc disease, degenerative joint disease of the knees, pes planus with severe pronation syndrome,[6] carpal tunnel syndrome, diabetes mellitus, hypertension, and obesity.  (R. 9, 25).  At step three, he found that none of these impairments, either singly or in combination, met or equaled any condition in the Listing of Impairments.  (R. 19-20, 25).

For the purposes of step four, the ALJ found that Mr. Hite had the RFC to perform work at the "light" exertional level with added restrictions to accommodate the post-hearing evidence from Dr. Gatewood on Mr. Hite's carpal tunnel syndrome:  lifting no more than fifteen pounds

---

[5] Mr. Hite applied for only insured disability benefits under Title II of the Act.  (R. 104). He did not also apply for benefits under the supplemental security income program of Title XVI for individuals who satisfy income and resources criteria.  Therefore, Mr. Hite must be found to have been disabled no later than the date he was last insured, September 30, 2001.

[6] Pes planus is "[f]latfoot; a foot with a fallen arch, so that most or all of the sole touches the ground."  4 J. E. Schmidt, *Attorneys' Dictionary of Medicine and Word Finder*, p. P-199 (Dec. 2005).  Pronation is "1. A kind of rotatory movement of the upper and lower limbs. . . . With reference to the right lower limb, it is the movement which turns the foot in a counter-clockwise direction.  With reference to the left lower limb, it is the movement in the opposite direction, i.e., one which turns the foot in a clockwise direction.  2.  A movement of the foot which turns the sole outward, with the outer margin of the foot higher than the inner margin."  5 *Attorneys' Dictionary of Medicine*, p. P-464.

occasionally and ten pounds frequently, and no operation of vibrating tools.  The ALJ's RFC conclusion was based on three factors:  (1) consistency with the objective medical evidence showing normal gait, fine motor functioning, and lack of neurological abnormalities, which he had discussed in relation to his step-three analysis, (R. 19, 20); (2) Dr. Maikranz' assessment of Mr. Hite's functional capacity which is supported in the record, (R. 20); and (3) the inconsistency of Mr. Hite's complaints of subjective symptoms, including pain, with the objective medical evidence and other evidence in the record, (R. 21).

The ALJ's conclusion that Mr. Hite's alleged disabling severity of his symptoms was inconsistent with the evidence was based on several reasons, tracking the factors for evaluation of subjective symptoms listed in 20 C.F.R. § 404.1529(c)(3) and S.S.R. 96-7p:

(1)  The evidence of Mr. Hite's activities of daily living showed that he has the ability to perform basic work-related activities.  (R. 21).

(2)  Regarding the location, duration, frequency, and intensity of Mr. Hite's pain and other symptoms, the ALJ first summarized some of the evidence regarding Mr. Hite's reports of problems with standing and walking and some of the medical findings related thereto, but without evaluative comment.  (R. 21).  The ALJ then found that, while Dr. Gatewood's opinion was credible that the findings of the post-hearing x-rays of Mr. Hite's lumbar-sacral spine, knees, and feet showed the same or similar degree of severity of impairments as existed when Mr. Hite was last insured, the conclusion that these impairments caused disabling symptoms and functional limitations was not credible.  The ALJ found Dr. Gatewood's medical opinion not credible for several reasons:  (a) until the x-rays were performed, Dr. Gatewood had seen Mr. Hite for all of his impairments only four times and his treatment of Mr. Hite's osteoarthritis was

8

limited to continuing pain medication; (b) it is reasonable to conclude that, if Dr. Gatewood had believed that Mr. Hite's chronic pain was a significant problem, then he would have ordered x-rays or other diagnostic tests at an earlier date but there is no indication in his office notes that such tests were even considered; (c) x-rays were not performed until only a few days after the hearing; (d) no evidence supports a conclusion that Mr. Hite's impairments, even if as severe as shown by the X-rays, had reduced his functional capacity below the light exertional level; and (e) Dr. Maikranz testified that the record does not establish a severe gait disturbance and difficulty in tandem walking (reported by consulting examiner Charles Kahi, M.D., (R. 246)) does not establish a severe gait disturbance or other inability to perform the ambulation required for light work.  (R. 21-22).

The ALJ found that the degree of Mr. Hite's carpal tunnel syndrome was moderate.  (R. 22).  He relied on evidence showing that Mr. Hite's grip and fine-motor skills are intact, his hand parasthesias was somewhat better when his diabetes medication was stopped, he reported carpal tunnel pain in his left wrist although the syndrome was documented in his right wrist, he reported that his carpal tunnel symptoms were much improved in November 2001, and, in March 2002, after his insured status expired, Mr. Hite reported not being bothered by carpal tunnel syndrome symptoms during the day.

The ALJ also summarized some of the evidence regarding Mr. Hite's high blood pressure and diabetes mellitus, but without evaluative comment.  (R. 22).

(3)  With regard to precipitating and aggravating factors, the ALJ stated only that his assessment took into account the lifting and vibrating-tools restrictions reported by Dr. Gatewood.  (R. 23).

9

(4)  Regarding type, dosage, effectiveness, and side effects of medication taken to alleviate pain or other symptoms, the ALJ summarized some of the evidence tending to show the effectiveness of Mr. Hite's diabetes and joint-pain medications.  The ALJ did not credit Mr. Hite's reports of fatigue and somnolence as disabling side effects of his medications because contemporaneous medical records recorded that he repeatedly denied fatigue for any reason and somnolence and Dr. Maikranz testified that Mr. Hite's Darvocet or non-steroidal anti-inflammatory drugs would not be expected to produce the degree of recumbence that he alleged. (R. 23).

(5)  Regarding non-medication treatments or other measures to relieve pain or other symptoms, the ALJ found that, although Mr. Hite has had to make adjustments to accommodate his impairments, none of the adjustments preclude work at the light level.  (R. 23).  The ALJ's supporting rationale was thin, however.  He noted that diet control had helped with Mr. Hite's diabetes.  He noted that Mr. Hite reported to a consultative examiner that his long use of orthotics was only marginally helpful and shoe inserts aggravated his back pain but the ALJ then noted only that new orthotics were made in November 1996 after the medial arches in previous ones collapsed and they seemed to work and fit well after adjustment but were completely worn by January 2000 requiring new casts to be made.  The ALJ finally noted that, just after Mr. Hite's insured status expired, night splints helped his carpal tunnel syndrome.

(6)  The ALJ made several findings regarding other factors affecting the evaluation of the credibility of subjective symptoms.  First, he rejected Dr. Gatewood's report that Mr. Hite's pain occasionally interferes with his attention and concentration because contemporaneous records show no cognitive disruption.  (R. 23).  Second, he rejected Mr. Hite's reported need to elevate

his legs because Dr. Maikranz testified that elevation of the legs is necessary only if effusion is present but the evidence shows no significant effusion, there is only one report of mild effusion without explanation, Mr. Hite's vascular examination was normal, and  there is no evidence of any other condition warranting elevation of the legs.  (*Id.*).

Third, the ALJ rejected Dr. Gatewood's opinion that Mr. Hite cannot perform repetitive reaching in any plane of motion with his right arm, that his grip and fine motor functioning have been significantly impacted, or that Mr. Hite's pain in his upper extremities is constant because the objective medical and other evidence contradicts the opinions in some instances and fails to support or corroborate it in others.  The ALJ credited Dr. Gatewood's opinion, and modified Dr. Maikranz's opinion accordingly, only to the extent of adding the lifting and vibrating-tool restrictions.  (R. 24).

Ms. Ditmore, the vocational expert at the second hearing, testified that Mr. Hite's previous work as an inspector is usually performed at a medium exertional level and his previous work as a union steward is usually performed at the light exertional level.  Based on the ALJ's finding that Mr. Hite can perform at the light exertional level, with the added lifting and vibrating-tool restrictions, Ms. Ditmore testified that Mr. Hite has the capacity to perform his past relevant work as a union steward.  The ALJ credited this testimony and, therefore, concluded that Mr. Hite is not disabled at step four of the five-step process because he retained the RFC to perform his past job as a union steward through September 30, 2001, his last insured date.  (R. 24).  The ALJ explained that the job of union steward is consistent with his RFC finding:  (a) none of the tools used by Mr. Hite, namely a pen or pencil and a notebook, were vibrating tools or weighed more than ten pounds; (b) the walking and standing that he did is

11

similar to the walking and standing that Mr. Hite does for yard work and grocery shopping; (c) the work environment permitted rest and lunch breaks that satisfy Mr. Hite's need to be off his feet for short times; and (d) the writing and paperwork required was brief during the day and more at the end of the day which is not inconsistent with his difficulties in grasping and holding a writing utensil.  (R. 24).

Mr. Hite asked the Appeals Council to review the ALJ's decision, (R. 12, 14), and submitted an appellate memorandum and copies of information from the *Physicians' Desk Reference* regarding the side effects of two of Mr. Hite's prescribed medications, Darvocet and Voltaren, (R. 9, 296-307), but the Council denied the request, (R. 6).  Thus, the ALJ's decision is the final decision of the Commissioner that the Court reviews.

### Substantial evidence:  foot, knee, and back pain

Mr. Hite first argues generally that substantial evidence does not support the ALJ's finding that his foot, knee, and lower-back pain does not preclude the standing and walking requirements for work at the light exertional level.  Mr. Hite broadly asserts the lack of substantial evidence and specifically asserts that the ALJ failed to give proper weight to the medical opinions of his treating physicians.

The ALJ agreed that Mr. Hite suffers from severe impairments that affect his feet, knees, and lower-back, specifically, degenerative disc disease, degenerative joint disease of the knees, and pes planus with severe pronation syndrome.  (R. 19, 25).  The ALJ did not explicitly find, but he also did not reject, that these impairments, at their level of severity, can cause the *type* of pain and other symptoms alleged by Mr. Hite; instead, he found only that the allegations and

opinions about the *disabling degree* of Mr. Hite's symptoms were not credible.  Mr. Hite

reported and testified that he is unable to work because pain in his feet, knees, and lower back

limits his standing and walking.  He testified that he can walk for only 10 to 15 minutes and

stand for only 30 minutes without pain, (R. 39), and then he must rest and/or take pain

medication, (R. 36).  His back pain is sometimes severe, (R. 35), and, when it flares up, it usually

lasts for eight hours, (R. 36).  His knee pain is also sometimes severe.  (R. 36).  Mr. Hite

described limited daily activities.  (R. 32, 39-41).  He rests in a recliner for four hours in the

middle of the day, (R. 42), during which time he usually dozes off after taking Darvocet, (R. 62).

At night, he will take Darvocet to ease his feet, knee, and back pain before sleeping.  (R. 41).

The ALJ asked Charles Kahi, M. D., a consulting examiner, to evaluate Mr. Hite for the

purpose of his disability application.  Mr. Kahi reported that Mr. Hite "has considerable

functional impairment due to his foot deformities and symptoms."  (R. 246).  Dr. Gatewood, Mr.

Hite's treating physician, completed questionnaires setting forth his medical opinions on Mr.

Hite's symptoms and their functional limitations:

> Mr. Hite has moderately severe lower-extremity and other pain that seriously affects his
> ability to function.  He has pain in his feet when walking over one block, (R. 252, 255);

> His complaints of lower-extremity and other pain are consistent with Dr. Gatewood's
> objective findings, (R. 252, 255);

> He occasionally (1-33% of the time) has lower-extremity and other pain that interferes
> with his ability to maintain attention and concentration sufficient to complete tasks in a
> timely manner, (R. 252, 255);

> He has swelling of his feet with walking, (R. 252);

> It is necessary that Mr. Hite elevate his legs at waist level or above for two or more hours
> out of an 8-hour day, as needed, for relief of pain and/or swelling, (R. 253);

13

He cannot stand/walk for six out of eight hours per day on a sustained basis, (R. 253);

He must have one 10-minute rest period per hour if he is up on his feet, (R. 254); and

It is necessary for Mr. Hite to lie down and/or rest for substantial periods of time during the day for relief of pain and/or fatigue, (R. 254).

The ALJ rejected Mr. Hite's testimony and the medical opinions of Drs. Kahi and Gatewood regarding Mr. Hite's functional limitations resulting from his impairments because he found them inconsistent with the objective medical evidence and other evidence of record.  (R. 20).  He accepted the opinion of Dr. Maikranz instead.  (*Id.*).

**Dr. Maikranz's opinions.**  At the hearing, Dr. Maikranz's testimony did not address all of the above testimony and medical opinion; she opined on specific topics inquired into by the ALJ.  She testified that Dr. Gatewood's opinion that Mr. Hite must elevate his legs was only conclusory, without supporting medically-acceptable clinical and laboratory diagnostic techniques; a leg-elevation requirement did not appear in the records or opinions of any other treating source; and there were no evident medical conditions, such as circulatory or cardiac problems, which would warrant such a requirement.  (R. 44).  She also opined that the requirement was contradicted by the absence of any evidence of significant effusion or swelling, the findings that Mr. Hite had normal ranges of motion, and Mr. Hite reported exercise two to three times a week.  (R. 46, 245-248).  She commented that the one report of mild right-knee effusion, (R. 185), did not support an elevation requirement because the nature of the effusion was not further explained and it was unknown whether it improved with medicine or other treatment.

The lack of diagnostic or laboratory findings supporting a medical opinion is a proper

14

ground for not fully crediting it.  20 C.F.R. § 404.1527(d)(3); S.S.R. 96-2p.  Because Dr.

Gatewood's opinion on leg elevation was unaccompanied by supporting documentation, the ALJ

did not commit error by not fully crediting them and relying on the absence of evidence of foot

or knee swelling and Dr. Maikranz' opinion that there were no conditions evident on the record

justifying an elevation requirement.  Although Dr. Maikranz was neither a treating nor an

examining physician, her opinion on whether grounds existed in the record for an elevation

requirement did not depend on a treating or examining relationship.  However, the facts that Dr.

Kahi found normal ranges of motion in Mr. Hite during one examination visit and that Mr. Hite

exercised two to three times a week do not provide substantial evidence that Mr. Hite does not

have pain or swelling that requires elevation of his legs for relief.  Mr. Hite testified and Dr.

Gatewood opined that Mr. Hite had pain and limitation, not with *any* walking or standing, but

with walking and standing for a period of time.  These allegations and opinions were not shown

to be inconsistent with Mr. Hite satisfactorily performing a range-of-motion test or exercising

two or three times a week without pain, especially when no details of the nature of the test and

exercise were provided.  In this respect, Dr. Maikranz's testimony was unsupported by medical

findings.  However, although these last grounds for Dr. Maikranz's testimony, and the ALJ's

reliance thereon, were insufficient for substantial evidence, the first two grounds were sufficient

to supply substantial evidence for the ALJ's rejection of a leg-elevation requirement.  Judicial

review does not guarantee claimants perfect administrative decisions, only valid ones under the

law.

Dr. Maikranz also opined that Mr. Hite's testimony and the medical opinion regarding

his functional limitations due to feet, knee, and back pain were not credible because objective

medical evidence showed that Mr. Hite had a normal gait and station.  (R. 48).  However, as with

the evidence of his normal range of motion and weekly exercise, it is not self-evident, and was

not shown, that Mr. Hite's alleged inability to engage in *sustained* walking and standing without

pain would manifest in an abnormal gait and station, especially in light of Mr. Hite's undisputed

testimony that he had been limiting his activities, including walking and standing, and that he

took frequent rests.

Dr. Maikranz testified that Dr. Kahi's report that Mr. Hite was unable to walk on his

heels and toes, tandem walk, hop, squat, and rise from a squatted position due to pain in both feet

was not inconsistent with the walking and standing requirements of light work because tandem

walking (*i.e.*, in-line, heel-to-toe walking) does not affect ambulation and heel and toe walking is

usually related to a lumbar-sacral condition that is not evident in the record.  (R. 51, 54-55).  Mr.

Hite did not impeach this rationale and substantial evidence supports the ALJ's acceptance of it.

Dr. Maikranz offered additional reasons for discrediting Mr. Hite's and the medical

opinions of the limiting effects of his symptoms that do not amount to substantial evidence.  She

testified that the fact that Mr. Hite was able to work for many years with flat feet was

inconsistent with his current complaints of disabling symptoms, but the medical evidence

accepted by the ALJ shows that Mr. Hite suffers from progressive conditions, such as

degenerative joint disease, which can be expected to deteriorate over time.  Dr. Maikranz

testified that Mr. Hite's long use of orthotics is inconsistent with his allegations, but the use of

orthotics confirms his symptoms of pain and some functional limitation but say little, if anything,

about the *degree* of his pain or limitation and Mr. Hite reported that the orthotics were only

marginally helpful.  Dr. Maikranz pointed to Mr. Hite's use of painkillers and that he used only one or two Darvocets per day, but the painkillers confirm his experience of pain, say little about the relief he actually obtains from the medicine or the residual functional limitation, and even the ALJ pointed out that Mr. Hite's self-limitation of activity and his rests could account for the low usage of Darvocet.  (R. 56).  Dr. Maikranz also pointed to Mr. Hite's testimony that he walks in his house during the day and that he can stand for 30 minutes without pain as inconsistent with his alleged limitations, but no details of the frequency or duration of Mr. Hite's in-house walks were given and Mr. Hite's ability to stand for 30 minutes does not suggest that he can stand or walk for six hours out of an eight-hour workday as required for light work.

Dr. Maikranz rejected Dr. Gatewood's opinion that Mr. Hite must take substantial rests and lie down during the day because he did not supply any objective medical findings to support his opinion.  She was correct, but the absence of supporting laboratory or clinical findings for a treating source's opinion means only that it is not due *controlling* weight; it must still be considered by the ALJ as a treating-source medical opinion.  S.S.R. 96-2p.  Dr. Gatewood's opinion is not inconsistent with Mr. Hite's testimony, Dr. Kahi's opinion, and other medical evidence in the record.  Substantial evidence does not support the ALJ's reliance on Dr. Maikranz's opinion to reject any weight for Dr. Gatewood's resting opinions.

Therefore,  Dr. Maikranz' medical opinion provides substantial evidence for the ALJ to reject Dr. Gatewood's leg-elevation requirement and Dr. Kahi's observation of Mr. Hite's inability to tandem walk, walk on his heels or toes, hop, squat, and rise from a squatted position as evidence of an inability to perform the walking and standing requirements of light work.  Dr.

Maikranz's opinion does not supply substantial evidence to reject Drs. Kahi's and Gatewood's other medical opinions on Mr. Hite's functional limitations.

**Activities of daily living.**  The ALJ also relied on Mr. Hite's activities of daily living, concluding that his ability to perform those activities is inconsistent with his alleged inability to perform the walking and standing requirements of light work.  However, while he listed some of Mr. Hite's testimony and reports of limitations, he did not evaluate them or provide a function-by-function analysis of why they indicate an ability to do light work.  It is a fact that is not self-evident.  The ALJ noted that Mr. Hite helps his wife with the dishes, but no other housework; he exercises two or three times a week, but without further description of the nature or duration of that exercise; he fishes from a boat once a week; goes out to eat once a week; and he reads the newspaper, watches television, and takes care of his own personal hygiene and grooming.  (R. 21).  None of these activities, alone or in combination, are reasonable inconsistent with an alleged inability to stand and/or walk for six out of an eight-hour work day on a sustained basis.  A claimant need not be disabled from any and all activity to be eligible for disability benefits; he need only be unable to perform the demands of sustained gainful activity.  On this record and the ALJ's rationale, there is nothing to indicate that Mr. Hite's daily activities are not the maximum effort that he can exert in light of his impairments and limitations.

**Location, duration, frequency, and intensity of pain.**  The ALJ did not credit Dr. Gatewood's medical opinions and Mr. Hite's testimony about Mr. Hite's functional limitations to the degrees alleged.  While he credited Dr. Gatewood's opinion that Mr. Hite's physical condition revealed in the post-hearing x-rays represented his condition at the time he was last

insured, the ALJ rejected the disabling limitations alleged from this condition because Dr. Gatewood had seen Mr. Hite only four times, had prescribed only pain medication, and had never ordered X-rays or other diagnostic tests until after the first hearing. The ALJ found that it was reasonable to conclude that, if Mr. Hite's chronic pain were considered a significant problem, then x-rays and/or other diagnostic tests would have been ordered earlier. This is a medical judgment for which there is no support in the record. There is no evidence or opinion from a medical source in the record that it would be necessary or expected to order diagnostic tests if treating sources credited Mr. Hite's complaints of disabling pain. There is no medical evidence in the record that x-rays were necessary to enable Mr. Hite's treating physicians — of whom there were many — to accurately diagnose his conditions or prescribe treatments and, in fact, there is no indication in the record that the actual x-rays did not corroborate the treating physicians' diagnoses and treatments. Perhaps the expected benefit of x-rays and other diagnostic tests did not outweigh the costs. The ALJ did not seek expert explanations from Mr. Hite's physicians or a medical expert on the necessity for x-rays or other diagnostic tests if Mr. Hite's complaints were credited and the ALJ cannot make such a medical judgment himself.

The ALJ also stated that there was no evidence in the record to support a conclusion that Mr. Hite's impairments reduced his functional capacity below that required for light work. (R. 22). This is merely a conclusory statement without supporting explanation or rationale and it is, in fact, incorrect: there was substantial evidence in the record, including Mr. Hite's own testimony and the medical opinions of treating physicians, that Mr. Hite's impairments rendered him functionally unable to perform work. Finally, in rejecting the disabling extent of Mr. Hite's impairments, the ALJ relied on Dr. Maikranz's statement that, despite Mr. Hite's severe

pronation problem, he had a normal gait and tandem-walking inability does not establish a light-work ambulation inability.  As discussed above, it was not shown that a normal gait observed at an examination reasonably indicates whether pain limits a claimant's ability to walk and stand for the extended periods of time required for light work and Dr. Maikranz's opinion on the irrelevancy of tandem walking to ambulation amounts to substantial evidence.

**Side effects of medication.**  Mr. Hite argued that the ALJ failed to consider the drowsiness and fatigue side effects of his medication.  Substantial evidence, however, supports the ALJ's rejection of disabling side effects because Mr. Hite denied such side effects during his testimony, (R. 38), and he repeatedly denied fatigue and drowsiness in contemporaneous medical reports.  The most that Mr. Hite asserted is that he often fell asleep while reclining for four hours during the day after taking a Darvocet to relieve his pain; however, he did not attribute his sleepiness to the Darvocet.  Mr. Hite presented references from the *Physicians' Desk Reference* indicating that fatigue and drowsiness are side effects of two of his medications, but Dr. Maikranz testified that the actual effect in a user is idiosyncratic and tolerances are built up over time, blunting the effect.  In light of this expert medical opinion and Mr. Hite's denials of drug-induced fatigue, substantial evidence supports the ALJ's finding.

**Dr. Gatewood's functional-limitation opinions.**  The ALJ did not credit most of Dr. Gatewood's opinions on Mr. Hite's functional limitations of walking and standing because they were not supported by medical records or clinical or laboratory findings.  (R. 23).  Because Dr. Gatewood's opinions were briefly set forth only in a series of questionnaires and were unaccompanied by explanations or supporting documentation, they are not entitled to controlling

20

weight.  S.S.R. 96-2p.  They are, however, still entitled, under the Commissioner's rules, to

consideration as medical opinions from a treating source.  *Id.*  Dr. Maikranz did not offer her

own independent evaluation of the extent of Mr. Hite's functional limitations based on the

evidence of record.[7]  To the extent that the ALJ rejected Dr. Gatewood's functional-limitation

opinions because similar restrictions were not documented by other treating or expert sources in

the record, that is not one of the factors provided in the Commissioner's regulations for

evaluating the weight to be accorded a treating medical opinion.  20 C.F.R. § 1527.

   **Post-hearing x-ray results.**  Dr. Maikranz noted the absence of radiographs and other

diagnostic tests as hindrances to her evaluation of Mr. Hite's condition and the credibility of his

treating sources' opinions on his functional limitations.  In addition to his request for a

supplemental hearing to address the ALJ's supplemental hypotheticals to the vocational expert,

Mr. Hite requested that the ALJ call a medical expert with specialization in orthopedics to testify

regarding the impact of the x-ray results but the ALJ denied the request.  There has been no

medical evaluation of the significance of the x-rays to Mr. Hite's impairments or his functional

limitations.  Given Dr. Maikranz's testimony about the need for x-rays, the ALJ's reliance on the

absence of supporting documentation for discrediting the medical opinions on functional

limitations, the fact that the medical experts have either not seen or opined on the functional

impact of the x-rays, and the ALJ's duty to develop the record, the ALJ should have sought

---

[7] Mr. Hite's representative began her questioning of Dr. Maikranz by referring to her "finding of light work," (R. 50), but the transcript does not contain a medical opinion or finding by Dr. Maikranz on Mr. Hite's overall RFC.  During the hearing, she was asked about only the medical bases for specific items of evidence in the record, including the opinions of Mr. Hite's treating physicians.

expert evaluation of the meaning of the x-rays for the severity of Mr. Hite's impairments and the degree of their functional limitation.

**Summary.**   Dr. Maikranz's testimony provides substantial evidence for the ALJ's rejection of Dr. Gatewood's opinion prescribing periodic leg elevation and Dr. Kahi's finding of various movement limitations as a basis for an ambulation limitation, and substantial evidence supports the ALJ's finding of no disabling side effects of Mr. Hite's medications.   Substantial evidence does not support the ALJ's reliance on Mr. Hite's activities of daily living, his normal gait and station on examination, and the absence of earlier x-rays and other diagnostic tests as reasons to not credit the allegations and opinions that Mr. Hite is functionally unable to engage in light work.   The ALJ erred in not obtaining expert evaluation of the post-hearing x-rays.   In this context, substantial evidence does not support the ALJ's rejection of Mr. Hite's allegations and Dr. Gatewood's medical opinions regarding the extent of Mr. Hite's subjective symptoms regarding his foot, knee, and back pain and the functional limitations resulting therefrom.

### Failure to properly consider opinions of treating physicians

Mr. Hite separately argued that the ALJ failed to properly consider or credit the opinions of Mr. Hite's treating physicians and obtain additional medical information and opinion in accordance with S.S.R. 96-2p and 20 C.F.R. §§ 404.1512 and 404.1527.   He also argued that the ALJ failed to follow S.S.R. 96-6p by not according the proper weight to Dr. Gatewood's opinions and his other treating physicians' opinions in light of their long treatment relationships and the lack of a similar relationship with Dr. Maikranz, on whom the ALJ chiefly relied.   These aspects of the ALJ's decision were discussed above in relation to Mr. Hite's general substantial-

evidence argument.  Mr. Hite is generally correct and the ALJ must re-consider Mr. Hite's

application in light of a proper application of the cited rules and regulations.

### Failure to mention side effects of medications

As discussed above, substantial evidence supports the ALJ's finding that any side effects

of Mr. Hite's medications do not significantly interfere, either singly or in combination with

other impairments or limitations, with his ability to perform work at the light exertional level.

### Past relevant work finding

Mr. Hite argues that the ALJ erred when he found that Mr. Hite could return to his job as

a union steward because he found that Mr. Hite could stand or walk for six hours in an eight-

hour work day but the job as union steward required Mr. Hite to be on his feet for seven hours.

However, a claimant must prove that he is unable to perform his past relevant work as he

actually performed it or as it is generally performed in the national economy.  *Bowen v. Yuckert*,

482 U.S. 137, 146 n. 5 (1987); S.S.R. 00-04p.  At the supplemental hearing, Ms. Ditmore, the

vocational expert, testified according to her own expertise and experience, and consistently with

the *Dictionary of Occupational Titles*, that the ALJ's walking/standing finding is consistent with

the job of union steward as it is generally performed.  (R. 83).  The ALJ did not err in relying on

Ms. Ditmore's testimony regarding the functional requirements of Mr. Hite's past work as a

union steward.

### Conclusion

There is not substantial evidence in the record to support the ALJ's denial of Mr. Hite's

application for disability benefits.  Mr. Hite's application will be remanded to the Commissioner

for re-evaluation consistent with this Entry.  Specifically, the Commissioner will properly

evaluate the credibility of Mr. Hite's subjective symptoms and the medical opinions on

functionality by his treating and examining physicians.  The Commissioner will obtain expert

medical appraisal of the post-hearing x-rays and their impact on the credibility of the testimony

and reports of Mr. Hite's functional limitations.  The Commissioner is not required to, although

he may, revisit the issues of the functionally-limiting side effects of Mr. Hite's medications and

the functional requirements of the job of union steward as generally performed in the economy.

No re-evaluation of Mr. Hite's carpal tunnel syndrome, diabetes mellitus, hypertension, or

obesity is required.

DONE this _____30th_____ day of March, 2006.


_____
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

James Matthew Dolenga
jimtheattorney@aol.com

Thomas E. Kieper
Assistant United States Attorney
tom.kieper@usdoj.gov